## JENKINS and another vs. GUNNISON, Executor.

*October 15 — November 10, 1880.*

*Suretyship: Application of proceeds of collaterals pledged by the principal: Construction of contract.*

G., being the owner of four notes of T., S. & Co., upon which M. & Co. were holden, as accommodation indorsers, to the amount of $17,000, extended said notes for nine, twelve, twenty-one and twenty-four months respectively; and, in consideration of such extension, T., S. & Co. gave him a mortgage of certain lands, and transferred to him as collaterals one hundred shares of stock in a boom company; and M. & Co. also gave him their bond (secured by mortgage) conditioned that T., S. & Co. should pay the two of the said extended notes first falling due, "on or before two years from this date, without any fraud or other delay." T., S. & Co. did not make voluntary payment of said notes independently of said collateral securities; but G. collected dividends from time to time on the boom stock held by him as security, sufficient to pay interest on all the notes and the principal sum named in the first three. *Held*, that the dividends should be so applied, and that the bond and mortgage of M. & Co. should be discharged of record.

TAYLOR, J., dissents, holding, in view of all the facts in the case, that G. was entitled to apply the proceeds of the boom stock in his hands to the payment of the notes not secured by M. & Co.'s mortgage.

Jenkins and another vs. Gunnison, Executor.

APPEAL from the Circuit Court for *Milwaukee* County.

The plaintiffs, as the owners of certain lots in the city of Milwaukee by deed from Joseph S. Mabbett, brought this action to remove a cloud upon their title created by a mortgage of said lots executed by said Mabbett to one Olivet W. Gunnison, to secure his bond of the same date. The conditions of said bond, and the ground upon which plaintiffs claimed that the obligation thereof had been fulfilled and that the mortgage should be discharged of record, are sufficiently stated in the opinions. The circuit court held that the plaintiffs were entitled to the relief demanded, and rendered judgment accordingly; from which the defendant (the executor of Olivet W. Gunnison) appealed.

*E. Mariner*, for the appellant.

For the respondents there was a brief by *Jenkins, Elliott & Winkler*, and oral argument by *Mr. Jenkins*.

COLE, J. This case presents a question not free from difficulty. After an attentive consideration of it, we are disposed, not without hesitation, to adopt the view taken of it by the court below. The circuit court held that the three first dividends on the boom stock which was transferred to the defendant's testator by Tyson, Sweet & Co. as collateral security, should be applied to the payment of the principal and interest of their note which became due July 1, 1874; that all the other payments should be applied, first, to the payment of the interest due at the respective dates of such payments upon the four notes of Tyson, Sweet & Co., and second, to the discharge of the principal of said notes in the order of their maturity. By this application of the payments, the first three notes would be discharged, and the court held that the plaintiffs were entitled to have the bond and mortgage executed by their grantor, J. S. Mabbett, satisfied of record.

The mortgage was given to secure the payment of a bond dated November 1, 1873, the condition of which reads as fol-

lows: " That whereas the said O. W. Gunnison is the holder and owner of notes against the firm of Tyson, Sweet & Co., upon which the firm of J. S. Mabbett & Co. is holden to the amount of $17,000; and whereas the said O. W. Gunnison has granted to said Tyson, Sweet & Co. an extension on said indebtedness for the period of nine, twelve, twenty-one and twenty-four months from October 1, 1873, to secure which extension the said Tyson, Sweet & Co. are to execute a mortgage upon lands in the state of Michigan: Now, therefore, if the said Tyson, Sweet & Co. shall pay the said sum of $4,250, which becomes due July 1, 1874, and the sum of $4,250 due October 1, 1874, with interest at ten per cent. per annum, on or before two years from this date, without any fraud or other delay, then this obligation to be void and of no effect." The firm of J. S. Mabbett & Co. were merely accommodation indorsers of the paper of Tyson, Sweet & Co., of which fact the payee, Gunnison, had knowledge. Besides the collateral security referred to in the condition of the bond, Tyson, Sweet & Co. had transferred to Gunnison one hundred shares of stock in the boom company, representing $10,000 of the capital stock of that company, as collateral security. In addition to all this security, the bond and mortgage were given by J. S. Mabbett, conditioned as above.

Now it is an admitted fact in the case, that enough money has been realized out of the securities or property turned out by Tyson, Sweet & Co. to Gunnison, to pay and discharge the first three notes. The question then arises, Did or did not that operate to discharge the bond and mortgage which an ordinary person would understand were given merely as collateral security for the payment of the first two notes? The astute and learned counsel for the defendant insists that this did not satisfy the condition of the bond, but that it may still be held to secure the payment of the fourth note. This position he attempts to maintain, as well from the words of the condition of the bond, as from the other considerations surround-

ing the transaction.   He says, in the construction of the
language used in the condition we must consider the circum-
stances of the parties when the instrument was executed, and
out of which it grew, in order to determine what the parties
really intended by it.   This is undoubtedly a correct rule of
construction in cases where the language of the contract is
ambiguous in its terms.   It is then permissible, not only to
look at the language used in the contract, but to construe that
language in the light of surrounding circumstances.   Indeed,
it may be proper in this case, and it certainly will aid us in
getting at the intention of the parties, to take into account
what the parties themselves may be presumed to have had in
view when the bond was made — such as the original debt, the
relation of all parties to it, the propositions of both parties for
extension, and the fact that the securities were all a part of the
arrangement which they had made and which was known to
all.

It should surely be borne in mind that all parties probably
knew what securities were given for the payment of the notes
on the extension.   Presumably, each party, in entering into
his engagement, acted with reference to that knowledge.   At
all events, we must assume that it was well understood that
Mabbett, in giving the bond and mortgage on his individual
property, did not occupy the position of principal debtor, but
that his liability in the matter was that of a surety merely.

On looking at the terms of the bond, the counsel says the
words "shall pay," in their ordinary, usual sense, mean the
voluntary rendering to another what is his due; that those
words signify or imply, in the condition, the actual payment
by Tyson, Sweet & Co. of the first two notes in cash, or out of
property which they had not turned out as collateral security.
And it is insisted that the bond could only be satisfied by
such a payment.   We are unable to agree with counsel in that
construction of the instrument; for suppose enough had been
realized out of the property turned out by Tyson, Sweet & Co. to

pay the entire indebtedness: is there any ground to claim that in that case the bond and mortgage would survive the extinguishment of the principal debt? It seems to us the proposition that the bond and mortgage in that case would be satisfied and discharged, is too plain for discussion. Again, in the recitals of the bond reference is made to the mortgage which Tyson, Sweet & Co. were to execute upon their property in Michigan. Is it not a fair inference that the parties expected and intended that the avails of that mortgage security should be appropriated to the payment of the notes in their order, at maturity? And I think it is an equally clear inference from the attending circumstances, that it was expected that the surety would have the benefit of all the collaterals which were turned out by Tyson, Sweet & Co. for the payment of the notes; for there was to be no breach of the bond until the last note became due, when Gunnison had the right to sell the boom stock and apply the proceeds to the amount due on the notes. It is true, it is provided in the arrangement which was made for the extension, that Gunnison should surrender to Tyson, Sweet & Co. $5,000 of the stock upon the payment of the first three notes, and had the right to retain the balance until the last note was paid. This stipulation was doubtless made on the supposition that Tyson, Sweet & Co. would meet their notes as they became due and before a breach of the bond. But this fact does not militate against the view we have taken of Mabbett's obligation.

It is said, however, that if the parties contemplated that the bond and mortgage should only secure the payment of the first two notes — the collaterals being applied as above indicated, — then these sureties perform no office, as it was apparent to all that enough would be realized out of the first-mentioned securities to discharge the first two notes. This is so, and this consideration has presented the chief difficulty in the case.

It is not easy to give a satisfactory reason for the execution

of the bond and mortgage upon the theory we have adopted, that they were only security for the payment of the first two notes. What advantage the parties expected to secure by such an arrangement, it is difficult to imagine. It must be remembered that, according to the original proposition of Tyson & Co. in regard to the stock, one-half thereof was to be surrendered on the payment of the first note, and not the first three notes as finally agreed. And Mabbett's proposition was, that his bond and mortgage should be collateral security for the whole indebtedness, instead of the first two notes. Why this change in the original propositions was made in the final agreement, we cannot tell. It is sufficient, perhaps, to say on this point that the parties must abide by the contract which they have made. Certain it is, the change made in the proposition is unaccountable, if the intention was that Mabbett's bond and mortgage should stand as security for the entire debt. And it seems to us, on the theory of the counsel for the defendant, that the change is inexplicable.

But there is another principle which must not be lost sight of in the construction of the bond; that is, the familiar doctrine that the obligation of a surety is *strictissimi juris*, and that nothing is to be taken against him by inference or intendment. *Smith v. Lockwood*, 34 Wis., 72. A proper attention to this rule of law forbids that any forced interpretation be placed upon the language of the bond. It does not surely, in terms, profess to be a security for the entire debt, but only for a specific portion of it; and it would be wrong to extend its effect as against the surety beyond what the language fairly implies.

Thus far we have considered the case without reference to the doctrine of the application of payments, a question much discussed on the argument. But there are no facts shown as to the application of payments which were made by either party, which can change our decision as to the liability of the

surety.   It follows that the judgment of the circuit court must be affirmed.

TAYLOR, J.   I am unable to agree with my associates in affirming the judgment of the circuit court in this case.   The facts as I understand them are these:   The firm of J. S. Mabbett & Co. were indorsers of four promissory notes of Tyson, Sweet & Co., each for the sum of $4,250, due in nine, twelve, twenty-one and twenty-four months from October 1, 1873, which notes were held and owned by the testator of the appellant.   Previous to giving said notes, said firm were indebted to the said testator, as accommodation makers of notes for Tyson, Sweet & Co., in the same sum of $17,000.   The firm desired that the testator should extend the time of payment of $17,000 by the said Tyson, Sweet & Co. to the time above specified; and the testator agreed to such extension, and took the four notes above mentioned, indorsed by the said firm, and also the following securities:

*First.*   A mortgage from Tyson, Sweet & Co., conditioned for the payment of all the four notes, upon certain lands in Michigan, supposed at the time to be of great value.   This mortgage was given not only to secure this debt of $17,000 of Tyson, Sweet & Co. to the testator, but also to secure other debts owing by said Tyson, Sweet & Co. to other persons. The amount of such other debts does not appear from the record.

*Second.*   The bond and mortgage of J. S. Mabbett for the sum of $9,000.   The bond recites that the testator is the owner of the four notes mentioned, upon which J. S. Mabbett & Co. are indorsers; that the testator had granted to Tyson, Sweet & Co. an extension of such indebtedness for nine, twelve, twenty-one and twenty-four months from October 1, 1873; and that, to secure the debt so extended, Tyson, Sweet & Co. are to execute a mortgage upon lands in the state of Michigan;

and it is then conditioned that if the said Tyson, Sweet & Co. shall pay the said $4,250 which becomes due July 1, 1874, and the $4,250 which becomes due October 1, 1874, with interest at ten per cent. per annum, on or before two years from the date of the bond, then the bond to be void, otherwise of force. The bond bears date November 1, 1873.

*Third.* The testator, at the same date of receiving the mortgage of the Michigan lands, and the bond and mortgage of J. S. Mabbett, received from Tyson, Sweet & Co., as security for the payment of said four notes of $4,250 each and the interest thereon, boom stock of the boom company of Manistee, Michigan, of the par value of $10,000; and for this stock the testator gave Tyson, Sweet & Co. a receipt, which, after reciting that the stock is received as collateral security for the payment of the four promissory notes above mentioned, proceeds to state the conditions upon which such stock is to be held as security, as follows: "And I hereby agree to and with said Tyson, Sweet & Co. that, upon the payment of the first three of said notes, to surrender to them (Tyson, Sweet & Co.) $5,000 of said stock, to wit, 50 shares thereof, and, upon payment of the last of said notes, will return to said Tyson, Sweet & Co. the balance of said stock so as above transferred to me. And I do hereby agree to and with said Tyson, Sweet & Co. that I will in no way part with said stock, nor in any way convey said stock to any one, but will hold the same in my possession as collateral to the payment of said notes. And it is hereby stipulated and agreed, and the said stock is received by me on the condition, that if, upon the maturity of the last of said notes, any of the said notes remain unpaid, I shall have the right to sell said stock at public sale, first giving said Tyson, Sweet & Co., or their assigns, twenty days' written notice of said sale, which notice shall be given personally to one of said firm, and the proceeds of said sale shall, after paying the expenses of such sale, be applied to the payment of such amount as may remain due me on said notes, and the

balance shall be by me paid over to said Tyson, Sweet & Co., or their assigns."

None of the notes were paid by Tyson, Sweet & Co., or by any one else, at maturity, but the testator or his executor have received the following sums from the securities above given: *First.* Dividends and proceeds of sale of boom stock as follows: 1874, September 11th, $500; 1875, January 5th, $500; 1876, January 5th, $1,075; 1876, July 19th, $500; 1877, April 11th, $700; 1877, December 26th, $300; 1878, March 25th, $3,500. *Second.* From the proceeds of the foreclosure of the mortgage of the Michigan lands, 1876, May 27th, $5,259.81. *Third.* From the sale of the boom stock, 1878, April 19th, $7,500. *Fourth.* For goods purchased by the testator from Tyson, Sweet & Co., due July 28th, 1874, $1,129.

There has been no application of the several sums above mentioned to the payment of any of the notes in particular, except as to the amount of the first three receipts for dividends on the stock. The first $500, it is alleged and not denied, was indorsed upon the note due nine months after date. Of the second sum of $500, $75 was indorsed upon the note due at twelve months, and $425 on the note due at twenty-four months. And as to the $1,075, it is alleged that the testator claimed that it should be applied so as to pay interest on all the notes to January 1, 1876, and the balance, if any, upon the note at nine months.

It will be seen that the amount collected for dividends, and on the sale of the boom stock, amounts to the sum of $14,075; the amount received for collections on the Michigan mortgage, $5,259; and $1,129 for goods sold to testator — in all amounting to the sum of $20,963. The notes, with interest at ten per cent. from their dates to the first of April, 1878, amount to the sum of $24,650; which would leave a balance unpaid of something over $3,687, as of the date of April, 1878. This is not intended as a statement of the amount actually due then, but is made for the purpose of showing that a consider-

able amount remains still uncollected and unpaid upon said notes.

The only question to be determined is, whether the moneys collected shall be applied in payment of the notes in the order in which they became due, and thus leave the unpaid balance due upon the note to become due in twenty-four months after the date thereof, and so relieve the mortgaged property of J. S. Mabbett from the mortgage given to secure the payment of the first two notes, or whether they shall be so applied as to leave the amount unpaid on the two notes to become first due, and thereby give the benefit of that security to the testator for the unpaid balance of the debt. There are two things appearing in the record which, in my opinion, have some bearing upon this question: *First*, when Tyson, Sweet & Co. put up the boom stock as collateral security, they proposed that $5,000 of the stock should be surrendered when the first note was paid. This proposition, it would seem, was rejected by Gunnison, and, as his receipt shows, he agreed to surrender the $5,000 of the stock only upon the payment of the first three of said notes, and stipulated that he should hold the other $5,000 until the last note was paid. *Second*, that J. S. Mabbett proposed to give his bond and mortgage for $9,000, as collateral security for the payment of the whole $17,000, and his bond and mortgage are so drawn as to be security for only the first two notes.

It will also be seen that only the sum of $1,000 was collected on any of the securities until after all the notes had become due and remained unpaid, and, in addition, Gunnison, the testator, had become indebted to Tyson, Sweet & Co. in the sum of $1,129 for property purchased of them previous to that time. The condition of the bond given by J. S. Mabbett was broken on the first day of November, 1875. At that date neither the first nor second note had been paid, even if all the money collected had been applied to the payment of these notes. If suit had then been commenced, there could have been no defense to the action; at all events, beyond the $2,129

above stated.  Has the mortgagee, Gunnison, lost his remedy upon this mortgage by converting the securities in his hands into money, and will equity compel him to so apply the money collected as to destroy that security?  If equity will do that now, then it must follow that, if J. S. Mabbett had paid the $9,000 due on his mortgage when it became due, he could have compelled Gunnison to have held his other collaterals for the benefit of Mabbett to the extent of the money so paid by him.  This appears to me to follow as a logical sequence; and if, upon such payment, Mabbett could not compel Gunnison to hold his other collaterals for his benefit, or to the extent of the money so paid by him, in preference to his right to apply such collaterals to the payment of the other two notes, then equity will not make that application now.

It was urged with great ability and force by the learned counsel for the appellant, that the condition of the bond could only be fulfilled by an actual payment of the first two notes by Tyson, Sweet & Co., and that they could not be paid so as to fulfill the condition by any application of moneys received from the other collaterals.  Still, I am of the opinion that if a court of equity would, as between Mabbett and Gunnison, compel the application of the other securities to the payment of the first two notes, and moneys sufficient to pay the same have come to the hands of Gunnison, then the bond must be declared satisfied.  If the condition of the bond had been the payment of the four notes, there could be no dispute that all the money received from the other collaterals would be applied to the payment of the notes, and the bond be held good only for the balance remaining due, although the condition had been in the same form as at present.  I think the case must turn upon the question of the application of the moneys received by Gunnison and his executor upon the other collaterals.

I do not think Mabbett can have any better standing in equity as to the application of the moneys raised on the se-

curity of the boom stock, than Tyson, Sweet & Co. Suppose, when the first two notes became due, Tyson, Sweet & Co. had paid the same in full: could they have compelled Gunnison to deliver up to them any part of the boom stock he held as collateral? It is very clear they could not; for the receipt given by Gunnison shows that he had the right to hold the whole of this stock until the first three notes were fully paid. Under this agreement it is clear that Gunnison had the right to hold the boom stock as security for the last two notes; and as between him and Tyson, Sweet & Co. he would have the right to apply all moneys collected on the other collaterals, including what he collected from Mabbett on his mortgage, to the payment in full of the first three notes, before he could have been compelled to deliver up any of the boom stock. The same result would have followed if, when Mabbett's bond and mortgage became due, he (Mabbett) had paid the first two notes: he could not have compelled Gunnison to deliver to him any of the boom stock which was held as collateral, nor to have held any part of it for his benefit, until the third note had also been paid, and then only to the extent of one-half of such stock. This being so, I think it follows, of necessity, that if, at the time Mabbett tendered payment of the first two notes, one-half of the stock had been converted into money, Mabbett could not have compelled the application of this money to the payment of either of the first two notes, without at the same time showing that Gunnison had received sufficient money from his other collaterals to pay also the third note, or unless he tendered enough so that the amount added to all the other money received on his other collaterals, including the amount received on the half of the boom stock, would pay the entire amount due on the first three notes. If he could compel the application of any part of the money received on the half of the boom stock to the payment of the first two notes, without also paying the third note, or showing that the other moneys received from the other collaterals, together with the amount

tendered, would pay the three notes, then he could compel that to be done which the parties had expressly agreed should not be done, viz., that only one-half of the boom stock should be surrendered when the first three notes were fully paid. To my mind it is clear that there is no equity in favor of Mabbett which would compel the application of any of the moneys received by Gunnison from the boom stock to the payment of the first two notes, unless it be shown that he had received enough from the other collaterals, including that received from Mabbett's mortgage, to pay the whole of the first three notes; and then only one-half of the money received from the boom stock could be so applied, leaving in Gunnison's hands the amount received on the other half for the payment of the fourth note.

The receipt given by Gunnison for the boom stock very clearly shows that he did not receive and hold it for the benefit of Mabbett, and to protect him against the payment of the first two notes; and the only way Mabbett can avail himself of the security of this boom stock in the payment of the first two notes, is by showing that the moneys received on one-half of such stock, together with the moneys received on the other collaterals, are sufficient to pay the first three notes. When he shows that, he shows that the contingency has happened which is stipulated for in the receipt given by Gunnison for the stock, upon which one-half of the stock is to be surrendered to the pledgors. It does not seem to me that the rights of the parties are changed by the fact that the stock has been converted into money, and does not remain in the shape of stock in the hands of Gunnison, unless it be shown that he has applied the money, or consented to have it applied, differently from what was stipulated as to the stock itself. As he clearly had the right to retain all the stock until three of the notes were fully paid, and half until all four were paid, it must, I think, follow that he may apply the half of the money received for the stock to the payment of the fourth note, and

the other half must be so applied as not to compel him to surrender any of his security for the first three notes until all three are paid. If it can be applied to the payment of the first two notes, and thereby release the security given by Mabbett, and the money so received from the other securities is not sufficient, when added to the money received for the half of the stock, to pay the first three notes in full, it results that Gunnison is compelled to surrender his security of the stock without payment in full of these notes, for the benefit of Mabbett, to the prejudice of Gunnison, and contrary to his express agreement with Tyson, Sweet & Co. Such an application of the moneys received would, I think, be inequitable and unjust, and in conflict with the rule suggested in this court in *Robbins v. Lincoln*, 12 Wis., 1, in which the rule is stated as follows: "In the absence of an application of payments by either party, the court should make such application as will be equitable and just under all the circumstances." This rule was recognized and acted upon in the case of *Hannan v. Engelmann*, 49 Wis., 278.

I think the circuit court erred in holding that the Mabbett mortgage was paid, and that the same should be discharged of record; and the judgment should be reversed.

*By the Court.*— Judgment affirmed.